UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATEWIDE BONDING, INC., *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> **Defendants.** | Civil Action No. 18-2115 (JEB) |

## MEMORANDUM OPINION

For much of this country's history, money bail offered persons detained on criminal charges one of the only ways they could obtain release. The Bail Reform Act of 1984 changed that for the federal system. Abolishing financial bonds and replacing them with a system of monitored release, the Act changed the architecture of pretrial detention. For all the reforms it enacted, however, it did not completely disentangle the federal government from money bail. This case involves one area in which such bonds persist: the release of certain non-citizens pending immigration proceedings.

Plaintiffs here are several companies and an individual involved in issuing bail bonds to persons in immigration detention. In their Complaint, they contend that the Department of Homeland Security is engaging in a host of unlawful practices with respect to those bonds. These are serious allegations that may well be worthy of judicial consideration. But not today. As the Court cannot discern from the pleadings what precise practices Plaintiffs take issue with, what legal claims derive therefrom, and how these Plaintiffs are harmed, it is bound to dismiss

1

the Complaint for lack of standing. Plaintiffs may amend, however, if, through clearer allegations, they can demonstrate that subject-matter jurisdiction does exist here.

I.  **Background**

This is one of several lawsuits Plaintiffs have filed in this Court seeking relief from Defendant DHS's immigration-bond practices. Two of the Plaintiffs — Statewide Bonding, Inc. and Big Marco Insurance and Bonding Services, LLC — are "bonding compan[ies] that issue[] criminal and immigration bonds throughout the United States." ECF No. 8 (Amended Complaint), ¶¶ 14–15. The others are Nexus Services, Inc., a business that helps immigrants obtain release from detention by guaranteeing their bonds, and Mike Donovan, Nexus's President and CEO. (For ease of reference, and unless distinguishing among Plaintiffs, the Court will refer to them collectively as "Statewide.")

They filed this suit against DHS and Immigration and Customs Enforcement back in September 2018, requesting monetary, declaratory, and injunctive relief for violations of the Administrative Procedure Act and the Due Process Clause and for breach of contract. See ECF No. 1 (Complaint) at 2–3. Soon after, Plaintiffs sought emergency relief in the form of a temporary restraining order. See ECF No. 4 (Motion for TRO). Concluding that they had not shown that they would suffer irreparable harm absent judicial intervention and expressing doubts about its jurisdictional basis, the Court denied the application. See Minute Order 10/5/2018. On October 16, Statewide filed an Amended Complaint seeking only declaratory and injunctive relief. See Amended Compl., ¶¶ 57–60. The precise facts and claims raised therein are somewhat difficult to divine — a concern to which the Court will soon return. Accepting the factual allegations as true, see Hurd v. District of Columbia, 864 F.3d 671, 678 (D.C. Cir. 2017), the following is nonetheless the best the Court can glean about Plaintiffs' case.

The dispute centers on DHS's immigration-bond practices. Certain persons in immigration custody — presumably those detained pursuant to 8 U.S.C. § 1226(a) — may be released on bond pending further proceedings. See 8 C.F.R. §§ 103.6, 236.1(c)(8). Many obtain bond with the help of companies like Statewide and Big Marco, perhaps with additional support from Nexus, although that is unclear. See Amended Compl., ¶ 16. Upon release from custody, they are supposed to receive "Notices to Appear" (NTAs) — documents containing information about the nature of their immigration proceedings and the time and place those proceedings will be held. See 8 U.S.C. § 1229(a). But DHS often issues NTAs without the time, place, or date of the next proceeding. See Amended Compl., ¶ 38. In addition, copies of the NTAs are not sent to the entities responsible for procuring the non-citizens' release and return — *viz.*, the bond companies and Nexus, as the bonds' guarantor. Id., ¶ 39. These practices make it less likely that immigrants released on bond will attend their subsequent hearings, thereby increasing the likelihood that bonds will be breached. Id., ¶¶ 40, 45–47.

Compounding matters, Statewide says, are the Government's abbreviated follow-up efforts after a bond is breached. In that event, DHS sends the bonding company a "Notice to Produce Alien" (NPA) — a document directing it to ensure the non-citizen's attendance at a hearing. Id., ¶¶ 48–50. Yet the NPAs allegedly give Plaintiffs less than ten days to track down persons who have missed the hearings, which they maintain is insufficient. Id., ¶ 52. Those practices, not surprisingly, thus lead to a substantial number of uncured bond breaches.

Where the Complaint gets more confusing is in its articulated causes of action, which are differentiated by form of relief rather than, as is appropriate, the substantive legal claim. Each count, in fact, conflates different claims under one heading. The first, for example, seeks "Declaratory Relief for violation of the Administrative Procedure[] Act . . . by disregarding the

requirements of, *inter alia*, 8 U.S.C. § 1229 and for violation of Procedural and Substantive Due Process Rights protected by the Due Process Clause 5th Amendment of the U.S. Constitution." Id. at 18. The second seeks "Injunctive Relief for violation of the Administrative Procedure[] Act . . . as well as Procedural and Substantive Due Process Rights." Id. at 19. In support of these claims, Statewide points to DHS's practice of issuing NTAs without a "time, date and place regarding immigrant court appearance" and sending NPAs with an "inadequate amount of time to produce an alien." Id., ¶ 58.

After filing the Amended Complaint, Plaintiffs filed a Motion for Declaratory Judgment and Permanent Injunctive Relief. See ECF No. 10. In addition to opposing that Motion, the Government has filed Motions to Dismiss for Lack of Jurisdiction under Rule 12(b)(1) and for More Definite Statement under Rule 12(e). See ECF No. 22 (MTD).

## II. Legal Standard

As the Court does not ultimately evaluate Plaintiffs' Motion, it sets out the standards only for those brought by Defendants. In analyzing their Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).

To survive a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims. See Lujan v. Defenders

of Wildlife, 504 U.S. 555, 561 (1992); US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 1350 (2d ed. 1987)) (alteration in original).

Rule 12(e) permits a defendant to move for a more definite statement if "a pleading . . . is so vague or ambiguous that the party cannot reasonably prepare a response." "[W]hen a defendant is unclear about the meaning of a particular allegation in the complaint, the proper course of action is not to move to dismiss but to move for a more definite statement." Hilska v. Jones, 217 F.R.D. 16, 21 (D.D.C. 2003) (quoting Am. Nurses' Ass'n v. Illinois, 783 F.2d 716, 725 (7th Cir. 1986)).

### III. Analysis

Before the Court are Motions filed by each side. Because the Court concludes that Plaintiffs have not adequately shown that they have standing to bring this case, it need not decide the remaining issues.

#### A. Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Defenders of Wildlife, 504 U.S. at 560. To maintain standing, a plaintiff must meet the following criteria. First, it "must have suffered an injury in fact — an invasion of a legally-protected interest which

5

is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." Id. (citations and internal quotation marks omitted). Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Id. (alterations in original) (citation and internal quotation marks omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (citation omitted). A "deficiency on any one of the three prongs suffices to defeat standing." US Ecology, 231 F.3d at 24.

Defendants object to Plaintiffs' standing in several respects. They principally argue that Statewide is not injured by any information that might be omitted on the Notices to Appear issued to non-citizens upon release from immigration custody. See MTD at 3–4. The Government also says that the Plaintiffs who are not parties to underlying bond contracts — namely, Nexus and Mike Donovan — are not properly included in this dispute. Id. at 9–13. The Court need not resolve these specific contentions, however, because it finds a more pervasive problem with Plaintiffs' standing: the Complaint's allegations are simply too unclear or incomplete for the Court to be assured that Plaintiffs may proceed. As the deficiencies span all three standing requirements, the Court will run through them in turn.

1. *Injury in Fact*

Statewide's Complaint initially falters at the first standing requirement: establishing that Plaintiffs have suffered a concrete and particularized injury. The allegations about injury can be summed up as follows: DHS's unlawful practices make it more likely that immigration bonds will be breached, and bond breaches cause reputational harm to Plaintiffs, result in monetary penalties, and threaten the existence of their businesses. See Amended Compl., ¶¶ 6–7, 29, 47,

56. These are the sorts of harms that do ordinarily give plaintiffs standing to bring lawsuits in federal court. The problem is that the Complaint is insufficiently specific about the nature of the harms, which parties will suffer them, and when.

Consider first the nature of the harms. Plaintiffs most clearly assert that the practices harm their reputations. Id., ¶¶ 6–7. Reputational harm typically gives rise to a cognizable injury in one of two situations. The first is when the harm causes a "loss of clients or other business" — *i.e.*, economic injury. See Morgan Drexen, Inc. v. CFPB, 785 F.3d 684, 692–93 (D.C. Cir. 2015). The second situation involves an individual whose reputation is damaged as a result of public stigmatization. See Foretich v. United States, 351 F.3d 1198, 1214 (D.C. Cir. 2003). There, the reputational harm itself is a concrete and particularized injury. It is not clear, however, which kind of injury Plaintiffs assert in this case. As profit-based enterprises, they presumably mean economic harm to their businesses, rather than stigmatic harms. Yet they do not substantiate or explain what economic effects the reputational harms are causing. And they certainly do not make out plausible allegations of stigmatic harm. Their "vague [and] conclusory" assertions of reputational harm are thus insufficient to establish injury. See Morgan Drexen, 785 F.3d at 692.

That naturally leads to Statewide's related suggestion that DHS's practices cause them direct economic injury not linked to reputation. They allege that they are "subject to significant monetary penalties" and are "essentially being driven out of business." Amended Compl., ¶¶ 6, 47. While these are generally the kinds of harms that can establish standing, see Carpenters Indust. Council v. Zinke, 854 F.3d 1, 5 (D.C. Cir. 2017), they are insufficiently specific to do so here. For starters, the Complaint does not say what the monetary penalties are or why they are paying them. Perhaps Plaintiffs refer to the amounts that must be paid to DHS for each bond that

is breached.  If that is their meaning, they should say as much and give some idea of the amounts of the penalties, the basis for them, and which party is paying them.  A specific example of a payment they made because of the Government's practices would be best.

The allegation that Plaintiffs are being driven out of business is vaguer still.  As a claim of future injury, it is cognizable only if it is "actually imminent" or if there is a "substantial risk" it will occur.  See Attias v. Carefirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017) (citations and quotation marks omitted).  Yet the Complaint contains no plausible allegation that DHS's practices create a substantial risk that Plaintiffs must shutter their doors.  Statewide does reference a statute and regulation authorizing the Government under some circumstances to prevent companies from posting bonds.  See Amended Compl., ¶ 6.  It does not, however, allege that the statute or regulation will in fact be triggered by DHS's challenged practice.  The Complaint also mentions that Plaintiffs are "subject to commands to stop writing business." Id., ¶ 9.  But it does not say whether such a command has occurred or is likely to occur in the future.  The suggestion of future injury thus falls short of the concrete allegations required.  The Court notes that at various points so far in this lawsuit, Statewide has offered additional information and evidence of some of these harms.  See ECF No. 4 (Mot. TRO).  That is not enough; such allegations must be present in the Complaint (or affidavits attached to it) to clear the bar set by Article III.  See Haase v. Sessions, 835 F.2d 902, 908 (D.C. Cir. 1987) (explaining that courts generally decide standing based on "examination of the face of the complaint").

The Court has already mentioned the next problem with Plaintiffs' injury allegations: they do not articulate which party or parties are being harmed.  To the extent it relies on monetary penalties, Statewide must explain which party is paying those penalties.  Are only the bonding companies responsible, or is Nexus implicated as well?  If only Nexus guarantees the

8

bonds, how are the bonding companies injured by a bond breach? These questions get to broader uncertainties about the relationship among the four Plaintiffs, as the Complaint does not adequately explain what role each party is playing in the process. The parts of Nexus and Mike Donovan, in particular, are opaque. For any amended complaint in this case to establish injury, it must clearly articulate the parties' businesses, their relationships, and what harms each suffers on account of DHS's practices. The Court must be able to assure itself that at least one Plaintiff has standing as to each claim for injunctive and declaratory relief. See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006).

Another concern with Plaintiffs' injury allegations also exists: they do not say when they have suffered or will suffer the purported harm. A number of questions in this regard remain unanswered. Have Plaintiffs already paid monetary penalties to the Government as a result of the practice? Are they going to be required to make monetary payments in the future? What past, current, and future concrete effects will the challenged practices have on their businesses? The Complaint hints at some answers but falls well short of the kind of detail and clarity necessary.

2. *Causation*

While Plaintiffs' standing problems begin with injury in fact, they do not end there. The Complaint is also deficient in establishing that their injuries are fairly traceable to the challenged conduct. Two infirmities are worthy of note. The first is that Plaintiffs have not adequately explained the contours of their legal claims so as to allow the Court to determine whether they have established causation for each such claim. As a rule, plaintiffs must "demonstrate standing for each claim [they] seek[] to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). In this case, since Statewide does not differentiate its claims formally, it is difficult to

9

discern what claims they bring. Recall that Count I seeks declaratory relief and Count II injunctive relief for violations of the APA and the Due Process Clause based on "the final agency action of (1) issuing an NTA that violated federal law by not having a specific time, date, and place regarding immigrant court appearance and (2) providing an inadequate amount of time to produce an alien regarding bond breaches." Amended Compl., ¶ 58. Does the Complaint seek to bring separate claims based on the agency's deficient NTAs and its inadequate NPAs? Or do both actions, rather, fall within a single allegedly unlawful policy or practice? The Court cannot determine.

Without clarity on these issues, the Court would have to hypothesize about what claims Statewide intends to bring in order to resolve the concerns the Government raises about causation. The crux of Defendants' Motion to Dismiss is that Plaintiffs may not base their standing on deficient NTAs, which do not cause them any harm. If Plaintiffs do maintain that the defective NTAs alone violate the APA or the Due Process Clause, the Court must decide whether the Government's assertions about the relationship between NTAs and Statewide are correct. If, on the other hand, Plaintiffs seek to bring a single claim based on the Government's combined practice of issuing deficient NTAs <u>and</u> issuing defective NPAs, DHS's causation argument may fall by the wayside since the flawed NPAs alone might be enough to establish the requisite causal chain. Either way, it would be imprudent for the Court to proceed with such an analysis absent clarification of the claims Plaintiffs seek to litigate.

The second causation problem goes to Statewide's broader failure to explain how DHS's practices — whether defective NTAs and NPAs together or each individually — harm them. From the Complaint, the Court understands that persons in immigration custody receive NTAs upon release that often lack key information and thus fail to turn up at subsequent hearings, and

the NPAs issued to Plaintiffs provide insufficient time to procure their clients before a breach is declared. See Amended Compl., ¶¶ 31–55. The Government, however, offers additional information and context for this process. It says that non-citizens on release often receive supplemental NTAs supplying the relevant information. See ECF No. 29 (Reply) at 2. If that is so, a bond breach may not be traceable to any deficiency in an initial NTA. DHS also asserts that many bond breaches result not from the non-citizen's failure to appear for immigration court proceedings but instead from their failure to appear at an ICE office in response to a demand notice. Id. The NTA may not have any relevance in such a situation. While the Court must accept as true Plaintiffs' non-conclusory allegations, it would behoove them to do a better job of outlining the bond process, the circumstances in which a bond is breached, and the particular role that NTAs and NPAs play therein. To the extent that only a certain category of bond breaches is traceable to the challenged practices, they should explain what that category is. At the current level of generality, it is difficult for the Court to determine whether it is the challenged practices or other intervening variables that are responsible for the harms Statewide alleges.

3. *Redressability*

For many of the same reasons, Plaintiffs fare little better on the final standing requirement: that a favorable judicial decision will redress their injuries. Just one point is worth reiterating: the Court needs a clearer understanding of Statewide's claims. If it seeks to challenge individual bond breaches, it must explain how an order from the Court can resolve any injury it suffered from those breaches. If Plaintiffs wish to challenge an ongoing policy or practice that they say is causing bond breaches, they should articulate what that policy or practice is. In particular, they should explain whether they are bringing separate claims based on DHS's alleged practice of issuing deficient NTAs and NPAs. The Court's redressability analysis

depends on the bounds of the claims, and it cannot at this point conduct that analysis given these uncertainties.

* * *

While courts often dismiss cases on standing grounds where plaintiffs cannot as a matter of law establish that they can meet the aforementioned criteria, see <u>Upshaw v. Progressive Insur. Co.</u>, 292 F. Supp. 3d 205, 209 (D.D.C. 2017), that is not the case here. Statewide, in fact, may very well have standing to pursue this case. But it is their burden to show as much. See <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 231 (1990) ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.") (citations and internal quotation marks omitted). Although they have not done so yet, the Court will dismiss only the Complaint, not the case, and offer them an opportunity to right their ship. See <u>Attias</u>, 865 F.3d at 624. Here, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of [P]laintiffs['] standing." <u>Haase</u>, 835 F.2d at 906 (citations omitted). The Court will thus dismiss the Complaint with leave to amend.

B. <u>Other Motions</u>

As Plaintiffs have not shown they have standing, the remaining Motions must necessarily be denied. Since Statewide may able to cure its deficiency, however, a few words are prudent as to the other two Motions before the Court.

The first is Defendants' request for a more definite statement under Rule 12(e). The Court has explained why Plaintiffs need to provide more detail in their Complaint to establish that they have standing. Such explanations should remedy any 12(e) problem. In particular,

Statewide should make clear whether they seek to challenge a DHS policy or practice or whether they seek review of individual bond breaches.  To the extent it is the former, they should articulate what policy or practice they are challenging and give specific examples of it.  See Haase, 835 F.2d at 902 ("Given the sweeping scope of the asserted policy, it is critical that the allegations of similar incidents be presented in detail."); see also Damus v. Nielsen, 313 F. Supp. 3d 317, 327, 340–41(D.D.C. 2018) (granting preliminary relief on APA claim based on informal agency practice supported by affidavits and examples).  Statewide has offered some evidence to the Court on this score separate from its Complaints, but it must also include such detail in its pleadings.  To the extent Plaintiffs seek review of individual bond breaches, as the Government seems to think, they should identify which breaches they are challenging.  This, of course, should be coupled with a clear description of each party, its relevant business here, and the relationship among the different Plaintiffs.

That leaves Plaintiffs' Motion for Declaratory and Injunctive Relief.  The Court notes that, even if the claims were clear, the Motion is premature because it seeks a decision on the merits before the prerequisite stages of litigation — namely, the filing of an administrative record and, if appropriate, discovery.  Plaintiffs now seem to recognize as much.  In opposing DHS's Rule 12(e) Motion, they argued that the clarification the Government has sought regarding their claims will be available to it in discovery.  See ECF No. 25 (Opp. to MTD) at 17–20.  Of course, discovery would not occur if the Court were to rule now on the merits.

## IV. Conclusion

For these reasons, the Court will grant Defendants' Motion to Dismiss the Complaint and deny Plaintiffs' Motion for Declaratory and Injunctive Relief. Plaintiffs may file an amended Complaint within 21 days of this decision. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: February 19, 2019